IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

WILLIAM J. WINTER,

    Plaintiff,

v.

ABBOTT LABORATORIES, et al.,

    Defendants.

Case No. 2:12-cv-00069
Judge Gregory L. Frost
Magistrate Judge Terrence P. Kemp

## TEMPORARY RESTRAINING ORDER AND OPINION

Defendant and Counterclaim Plaintiff Abbott Laboratories ("Abbott") has filed a Motion for Temporary Restraining Order ("TRO"), seeking injunctive relief to protect against the theft and misappropriation of intellectual property in which Plaintiff William J. Winter has allegedly engaged. (ECF No. 17.) Winter filed a Memorandum in Opposition to Abbott's Motion for TRO (ECF No. 19) and this Court convened a hearing on Abbott's Motion on the evening of March 21, 2012. For the reasons set forth below, the Court **GRANTS** Abbott's Motion and issues a TRO. The Court, however, **DENIES** Abbott's request for expedited discovery.

### I. Background

The Court culls the facts set forth below from the pleadings and evidentiary materials submitted to the Court in the TRO proceedings. The factual recitation provided here is for the limited purpose of addressing the immediate motions before the Court. Any findings of fact and conclusions of law made by a district court in addressing a request for injunctive relief are not binding at a trial on the merits. *See United States v. Edward Rose & Sons*, 384 F.3d 258, 261

(6th Cir. 2004) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981)).

Winter is a patent attorney who worked for Abbott from 2002 until his termination in July 2011. He signed an "Employee Agreement" with Abbott when he joined the company. (*See* Counterclaim, Ex. 1, ECF No. 23-1.) Paragraph 2 of the Agreement provides that all documents made, compiled by, or made available to Winter during his employment remained Abbott's property. (*Id.* at 1, ¶ 2.) The Agreement further provided that Winter return all copies of any such documents to Abbott upon the termination of his employment. (*Id.*) The Agreement was executed on December 9, 2002. (*Id.* at 2.)

At Abbott, Winter worked with the Nutrition Division. (Counterclaim, ECF No. 23, at ¶ 6.) In that role, Winter routinely possessed highly confidential information related to future products and other internal company information that was unknown to the marketplace. (*Id.* at ¶ 7.) Specifically, Winter was involved with others at Abbott in creating and implementing Abbott's intellectual property strategy, including for new Abbott Nutrition products and trade secrets. (Goller Decl., ECF No. 17-2, at ¶ 4.)

Abbott terminated Winter's employment on July 26, 2011. (Compl., ECF No. 4, at ¶ 1.) At the time of his termination, Winter had more than 20 years of experience as a patent lawyer and held the title of "Senior Counsel" at Abbott. (*Id.* at ¶ 5.) Five months later, Wnter filed a Complaint in the Franklin County (Ohio) Court of Common Pleas on December 20, 2011, alleging one count of age discrimination under Ohio state law. (*Id.* at ¶ 22.) Defendants jointly removed the action to this Court, invoking federal diversity jurisdiction. (Notice of Removal,

ECF No. 2.)[1]

In connection with its investigation of Winter's claims in this lawsuit, Abbott hired Epiq Systems, a third-party computer forensics vendor, to conduct a forensic analysis of the laptop computer Winter used while employed at Abbott. (Goller Decl., ECF No. 17-2, at ¶ 5.) Epiq's forensic analysis revealed that Winter downloaded at least 14 unique documents from Abbott's computer system on at least six different days. (Litchfield Decl., ECF No. 17-4, at ¶ 15.) Winter used eight different removable media devices for this purpose. (*Id.* at ¶ 12.) Upon learning of what Epiq's analysis revealed, Abbott reviewed its files and found that at least four of the documents that Winter copied contained confidential, proprietary, and privileged information related to Abbott's intellectual property strategy. (Goller Decl., ¶¶ 6-11.)[2]

Three of the documents downloaded by Winter contain information from meetings of Abbott's Intellectual Assett Committee ("IAC"). (*Id.* at ¶ 8.) The IAC meets regularly to review, assess, and decide matters related to the Nutrition Division's strategy relating to new or in-development inventions. (*Id.*) The IAC documents copied by Winter relate to two meetings at which two broad categories of sensitive information were discussed—new Abbott inventions and Abbott's global patent strategy related to United States patent applications that have not yet been made public. (*Id.* at ¶ 9.) The IAC documents are designated as "privileged and confidential" by Abbott: not only do they reflect sensitive company information, but the work of

---

[1]Winter sued Abbott and two individuals, Mimi Goller and Kevin Mason. Goller was Winter's direct supervisor at Abbott. (Compl., ECF No. 4, at ¶ 3; Goller Decl., ECF No. 17-2, at ¶ 4.) Mason works in Human Resources in Abbott's Columbus, Ohio office. (Mason Aff., ECF No. 2-3, at ¶ 2.) Mason has since been dismissed from this lawsuit. (ECF No. 20.)

[2]The four documents were provided to the Court for *in camera* inspection at the hearing on Abbott's Motion for TRO.

the IAC includes legal advice provided by Abbott lawyers on the committee. (*Id.* at ¶ 10.)

Another document taken by Winter is a detailed spreadsheet that contains information about every project that Winter was working on at the time of his termination from Abbott's employ. The document includes a legal assessment of the patentability of each of Abbott's in-development products assigned to Winter, as well as other confidential information relating to these products. (*Id.* at ¶ 11.) Epiq's forensic analysis suggests that the file downloaded to Winter's media device is a newer, updated version of the document than the one stored on the hard drive of Winter's work computer at Abbott. (Litchfield Decl., ECF No 17-4, at ¶ 19.)

In addition, the forensic analysis of Winter's work computer showed that Winter may have downloaded *and deleted* a document from Abbott's computer system. Epiq's analysis showed a document copied to a removable media device; yet, the same document could not be found on Winter's work laptop or elsewhere in Abbott's computer system, prompting concern that Winter deleted the file. (*Id.* at ¶ 20; Goller Decl., ECF No. 17-2, at ¶ 13.) The deletion of this file is particularly noteworthy: based on the document's file name, it appears that the document contains Winter's notes related to the "Simply Smart" baby bottle project on which Winter worked and which led to Winter's ultimate employment termination. (Goller Decl., at ¶ 13.) Abbott is therefore concerned that the document is "likely" to contain information relevant to the claims and defenses in this litigation. (Motion for TRO, ECF No. 17, at 7.)

Prompted by what it learned from Epiq's forensic analysis and its investigation of the documents downloaded by Winter, Abbott filed a Counterclaim and Motion for TRO on the night of March 21, 2012. (ECF Nos. 17, 18.) Abbott's counsel contacted Winter's counsel by telephone that same night to give notice of this Court's setting of a S.D. Local Rule 65.1

conference and TRO hearing the following day. The court held a Rule 65.1 conference 5:30 p.m. on March 22, 2012, followed by the TRO hearing immediately thereafter. As Winter's two primary attorneys of record were out of state, the Court permitted them to participate in the hearing by telephone. Accordingly, this Court deems the TRO proceeding to have been convened with notice, thereby removing the matter from the time strictures in Fed. R. Civ. P. 65(b) applicable to *ex parte* TROs.

## II. Discussion

When ruling on a motion for TRO, a district court must consider and balance four familiar factors — (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *See e.g. American Sys. Consulting, Inc. v. Devier*, 514 F. Supp. 2d 1001, 1009 (S.D. Ohio 2007). These factors are not hard-and-fast prerequisites that must be met; rather, the Court balances these factors in a "weighing of the equities involved." *Id.*

### A. Counterclaim For Damages Does Not Foreclose TRO

As an initial matter, this Court addressed an issue raised by Winter at the oral hearing on Abbott's Motion for TRO. Winter questioned whether the Court may grant a TRO under Fed. R. Civ. P. 65 when Abbott's Counterclaim seeks only damages in its prayer for relief. (*See* ECF No. 23, at 7.) Winter calls it "textbook law" that a litigant may not recover equitable relief if it is seeking damages. And because Abbott seeks only damages in its Counterclaim, Winter says there is "no pleading basis" upon which a TRO can be predicated.

Winter's argument on this point is not well taken. Winter cited no case authority for the proposition that a litigant cannot obtain a TRO when the complaint (or counterclaim, as here) seeks only damages. Though Winter's general principle may be true in the context of what remedies may be awarded upon *final* judgment, it does not necessarily follow that preliminary relief, such as a TRO, is unobtainable to try to forestall irreparable harm that may occur prior to judgment. The Court therefore proceeds to the merits of Abbott's request for a TRO.[3]

**B.      Likelihood of Success on the Merits**

At this point in the case, this Court agrees with Abbott that it has demonstrated a strong likelihood of success on the merits of, at the very least, its breach-of-contract counterclaim. The Employee Agreement that Winter entered into with Abbott in 2002 is express in its obligations regarding the work product "made or compiled by or made available to" Winter during the course of his employment. Specifically, these materials were solely Abbott's property and any such materials in Winter's possession had to be returned to Abbott upon the termination of his employment. (Agreement, ECF No. 23-1, at ¶ 2.)

The declaration of forensic computer examiner, Anton Litchfield of Epiq Systems, Inc., persuasively establishes that Winter downloaded a multitude of Abbott computer files onto flash drives in the days leading up to his employment termination. (Litchfield Decl., ¶ 15, ECF No. 17-4.) Winter downloaded *at least* 14 specific files using eight different removable media devices. (*Id.* at ¶¶ 12, 15.) What's more, Winter concedes that he downloaded Abbott files and took them with him after his employment termination. (Plf. Mem. In Opp., ECF No. 19, at 2.)

---

[3]In rebuttal to Winter's argument on this point, Abbott made an oral motion at the TRO motion hearing to amend its counterclaim. In light of the Court's ruling on the issue, the Court deems the motion moot at this time.

In both his Opposition brief and at the oral argument, Winter's counsel argues that Winter did not take these files in order to misappropriate them or to commercially harm Abbott. Playing the victim card, Winter's counsel explained at the hearing that he took these documents simply to gather proof that Abbott's reason for terminating his employment was a pretext for age discrimination and that removing them was necessary due to the fact that Abbott would likely not turn these documents over in discovery. Winter's motive, however, is irrelevant. The fact of the matter is that Winter stole (for lack of a better word) files from Abbott when he left Abbott's employ. This fact, which Winter does not deny and which is supported by the forensic evidence gathered thus far by Abbott, establishes that Abbott is likely to succeed on its Counterclaim, at least as to the count alleging breach of contract.

### C. Irreparable Harm

As to the irreparable harm prong of the TRO analysis, Abbott contends that two forms of possible harm are afoot — the potential for disclosure of confidential trade secrets of Abbott and the potential for destruction of evidence. (Mot. for TRO, ECF No. 17, at 8-9.) The Court finds that both forms of harm are present here and militate in favor of a TRO.

As to the potential harm of destruction, the Court is reminded that the TRO is an extraordinary remedy whose purpose is to preserve the status quo. *Ingham v. Toledo City Sch. Dist. Bd. of Edn.*, 339 F. Supp. 2d 998, 1003 (N.D. Ohio 2004). Toward that end, a district court may grant injunctive relief to effect preventive or protective relief. *Id.* Thus, issuance of a protection order is appropriate when there is a significant risk that relevant evidence will be lost or destroyed. *See American LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1072 (C.D. Cal. 2009); *see also Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135 (Fed. Cl. 2004). Here,

the evidence before the Court indicates that there is a significant risk of destruction.

Winter may have already destroyed at least one document. Forensic analysis by Abbott's outside vendor revealed that one of the files downloaded by Winter from his work computer at Abbott cannot be found on either Abbott's computer system or on Winter's former work computer. (Goller Decl., ¶ 13, ECF No. 17-2; Litchfield Decl., ¶ 20.) Significantly, based on the document's file name, there is a justifiable belief that the document relates to the Simply Smart baby bottle project that is described in Winter's Complaint and that Abbott's counsel has cited (in both the Motion for TRO and the oral hearing) to be the project that ultimately led to the decision to terminate Winter's employment. Thus, there is evidence not only of Winter's destruction of evidence but a legitimate suspicion that the destroyed document is relevant to this litigation.

In light of this instance of destruction, the Court finds there is legitimate reason to fear that Winter would destroy other Abbott documents in his possession absent an order restraining him from doing so. *See American LegalNet* at 1073 (citing the fact of documents already having been destroyed as a factor showing existence of that risk absent an order to preserve). And though Abbott probably would rather that Winter had not taken these documents with him in the first place last July, Winter's destruction of them now would be problematic because Winter's possession of them is crucial evidence to support Abbott's counterclaims. Destroying the evidence now could mean that the evidence of what Winter took is forever lost.[4]

---

[4]At the oral hearing on the Motion for TRO, Winter took the position that Abbott would already know what files he took, a supposed fact he cited as cutting against some of the relief that Abbott seeks in its Motion for TRO. In his Declaration, however, Abbott's third-party forensic computer analyst stated that it is not possible to determine the full extent of the files downloaded onto Winter's flash drives without "a forensic analysis of those devices and of the

8

Though the real potential of destroyed evidence is enough to show irreparable harm, this Court also finds that potential disclosure of the information Winter took away from Abbott constitutes a legitimate threat of harm. Citing to Winter's LinkedIn® profile available on the Internet, Abbott observes that Winter is holding himself out to the public as a "Patent Strategy Consultant," describing his practice as providing "seminars and workshops to educate and motivate scientists and engineers to develop and extract commercially significant and patentable inventions from their new products and technology." (Mot. For TRO, Ex. E, ECF No. 17-6.) The description of such a practice is similar enough to what he did for Abbott that Abbott argues the "inevitable disclosure doctrine" is in play, particularly if Winter is working with clients who develop nutrition products. *See MP TotalCare Servs., Inc. v. Mattimoe*, 648 F. Supp. 2d 956, 968-69 (N.D. Ohio 2009) ("where an employee with detailed, comprehensive knowledge of an employer's trade secrets and confidential information begins employment with a competitor in a substantially similar position, her disclosure of trade secret information is inevitable").

In his Opposition to the Motion for TRO, Winter's counsel downplayed the risk of disclosure, noting that Winter "has recently started work as a pharmacist" and the information he took would therefore be "useless" to his new employer. (ECF No. 19, at 3.) During the oral hearing, however, Winter's counsel did not repeat this representation, instead repeatedly referring to his client being an "attorney." It is, at best, unclear to the Court what Winter's current occupation is. Under these circumstances, the Court does not have sufficient information before it to find irreparable harm based on the "inevitable disclosure doctrine."

---

computers on which the flash drives were subsequently utilized." (Litchfield Decl., ECF No. 17-4, at ¶ 17.)

The Court is, however, persuaded that there is a great enough risk of disclosure that Abbott has made a sufficient showing of irreparable harm. In reaching this conclusion, the nature of the materials that Winter appears to have taken from Abbott is not lost on this Court. The Court viewed *in camera* four exhibits that Abbott submitted in advance of the TRO hearing and heard argument from Abbott concerning the significance of these documents during the hearing.[5] Upon its *in camera* review of these documents, the Court is persuaded that these documents are highly confidential and commercially sensitive materials containing nonpublic information that would be valuable to Abbott's competitors in the marketplace. Winter has already stolen (for lack of a better word) these materials on his way out the door at Abbott and has already disclosed them to at least two attorneys (including his current counsel), persons who are not otherwise bound by a protective order or any other duty of confidentiality owed to Abbott. Winter's willingness to not only take these materials from Abbott but also to disclose them, regardless of whether his motive was truly limited to being able to secure evidence to support his employment discrimination claim, convinces this Court that there is a risk of disclosure that justifies injunctive relief here.

During the oral argument on the TRO Motion, Winter's counsel spoke to the delay of some seven months between the termination of Winter's employment last July and Abbott's performance of a forensic analysis of his work computer. Winter argues that the lack of urgency evidenced by this delay cuts against injunctive relief. The Court does not, however, find that Abbott has unduly delayed its request for the relief sought here.

---

[5]Due to the commercially sensitive nature of the documents discussed, the Court granted Abbott's oral motion to have the transcript of that portion of the hearing in which Abbott's counsel discussed the four *in camera* exhibits placed under seal.

Winter is an attorney and, as such, was (and is) duty-bound to preserve his client's confidential information. Given Winter's ethical obligations as an attorney and Winter's obligations arising out of his Employment Agreement, and absent any evidence to show otherwise, the Court does not find that Abbott should have reasonably foreseen that Winter would walk out the door with Abbott property when he left Abbott's employ. On the facts presented to the Court, it was not unreasonable for Abbott to obtain the forensic imaging of Winter's work computer until February 2012, at a time when Winter's lawsuit had been filed only two months earlier and immediately upon suspecting that Winter may have left the company with downloaded files in his possession.

### D. Harm to Others

The Court finds that the "harm to others" factor does not counsel against issuance of a TRO. It has not been argued that injunctive relief here would do harm to any non-party. Rather, it appears that the only party affected by a TRO would be Winter. And this Court can conceive of no harm to Winter if he is prohibited from using information that he had no legal right to take with him when he left Abbott's employ. Nor does the Court find that Winter would be harmed by an order that requires him to preserve the materials he downloaded and took from Abbott and to refrain from destruction of the materials (as they are now evidence, at least with respect to Abbott's Counterclaim).

### E. Public Interest

Upholding reasonable contracts is generally in the public interest. *See Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1008 (S.D. Ohio 2008) (citing *Rathford v. Proprietors' Ins.*, 47 Ohio St. 3d 1, 8, 546 N.E.2d 1299 (1989)). And so is maintaining commercial ethics in the

context of protecting trade secrets in which employers have placed substantial investment. *See Kendall Holdings Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 869 (S.D. Ohio 2008) (quoting *ALTA Analytics, Inc. v. Muuss*, 75 F.Supp.2d 773, 786 (S.D. Ohio 1999)). Both of these interests are implicated in this case and weigh in favor of granting a TRO to restrain Winter from disclosing highly sensitive and confidential intellectual property of Abbott.

F.     **Forensic Imaging of Winter's Personal Computers and Media Devices**

Abbott seeks expedited discovery as part of the TRO. Abbott proposes that Winter submit his thumb drives and personal computer(s) on which Winter utilized those drives to Abbott's third-party vendor for a forensic copy and analysis. (Mot. For TRO, ECF No. 17, at 13-14.) Abbott's proposed TRO would also command Winter to submit to a deposition within 11 days of a TRO's issuance. (*Id.*, Ex. F.) Notwithstanding the fact that the Court is troubled by Winter's conduct—he is an attorney who did nothing less than steal documents from his employer as he left, ostensibly to engage in self-help discovery in his intended lawsuit against the company—the Court declines to enter an order granting expedited discovery at this time.

A court may authorize expedited discovery under Fed. R. Civ. P. 26(d) upon a showing of good cause. Abbott cites many of the same reasons underlying its TRO motion as the "good cause" supporting issuance of an expedited discovery order that would require Winter to submit his personal computers and media devices (*viz.*, the thumb drives to which he downloaded Abbott files). Expedited forensic of Winter's devices argues Abbott, "will allow Abbott to determine the extent of Winter's breach of contract and the extent to which Abbott's confidential and proprietary information has been used and disclosed." (Mot. For TRO, ECF No. 17, at 14.) Abbott contends in its Motion and argued during the hearing that the granting of such relief is

"routine" in the context of a TRO proceeding, citing numerous cases that purport to stand for that proposition. (*Id.* at 10-11.)

A close reading of the cases cited by Abbott, however, shows that none squarely stands for the principle that expedited discovery of the kind it seeks here is "routine" in conjunction with the issuance of a TRO. The closest case on point is *Océ North Am., Inc. v. MCS Servs., Inc.,* No. WMN-10-0984, 2011 WL 6130542, at *1 (D. Md. Dec. 7, 2011), in which the district court issued a TRO preventing destruction of evidence. The cited case also makes reference to a separate order granting permission to have a the plaintiff's forensic expert image the hard drives of the defendants' computers. *Id.* But the case offers no insight into why the court ordered the expedited forensic imaging under those circumstances.

In this case, Abbott has not made the case for expedited discovery. Indeed, in the Loc.R. 65.1 conference prior the hearing on the TRO, Abbott candidly acknowledged that the expedited deposition of Winter (also requested in Abbott's Motion for TRO papers) would be unnecessary provided that an appropriate order was in place that prevented the destruction and disclosure of the materials that Winter took from Abbott (in apparent violation of Winter's Employment Agreement). If this is true for the deposition of Winter, the Court sees no reason why forensic imaging on the expedited basis proposed by Abbott would be necessary. As will be detailed below, this Court is entering a TRO that prevents the destruction and disclosure of the materials Winter took from Abbott. Though it is tempting for the Court to order the forensic imaging in this case, the Court concludes that the TRO it is ordering here provides ample protection.

The parties are free, of course, to address the forensic imaging issue at the initial pretrial conference on April 10, 2012, at which this Court fully expects that discovery issues will be

discussed between the parties. The parties are strongly encouraged to reach agreement (at or before the pretrial conference) on the appropriate time frame and protocol for accomplishing the forensic imaging and analysis of Winter's relevant devices. In the meantime, this Court fully expects that the status quo will remain intact as to these materials. Per the Order of this Court (and as detailed further below), Winter will not destroy anything, will maintain the documents and information on those devices, and will not disclose the materials to anyone.

### III. Temporary Restraining Order

For the reasons set forth above and upon consideration of the pleadings, declarations, memoranda, exhibits filed in support of Abbott' Motion, the exhibits provided for *in camera* review, and the oral arguments of the parties, the Court finds that a Temporary Restraining Order is necessary to prevent immediate and irreparable injury to Abbott. The Court further finds that Abbott has demonstrated a likelihood of success on its breach of contract counterclaim and that the balance of equity and interests of justice support granting such relief. Accordingly,

**IT IS HEREBY ORDERED** as follows:

1. Plaintiff William Winter is **immediately restrained** from:

    a. Disclosing any documents or information contained in documents that were taken, copied, or downloaded from Abbott prior to Mr. Winter's termination; and

    b. Destroying any documents or other materials taken, copied, or downloaded from Abbott prior to his termination, including all electronic or hard copies.

2. Plaintiff Winter is **required** to preserve all documents or other materials taken, copied, or downloaded from Abbott prior to his termination, including all electronic or hard copies.

3. This temporary restraining order expires on April 12, 2012, unless extended by order of this Court for good cause or by Plaintiff's consent.

4. This matter is scheduled for a preliminary injunction hearing **on Thursday, April 12, 2012, at 9:00 a.m. in Courtroom # 5.**

**IT IS SO ORDERED.**

                                        **/s/ Gregory L. Frost**
                                        **GREGORY L. FROST**
                                        **UNITED STATES DISTRICT JUDGE**